UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

CARLOS DAVILA, President of A New : 
Beginning for Immigrants Rights, Inc., :
                                       :
                           Plaintiff,  :          1:18-cv-6164-GHW
             -v-                       :
                                       :
STEVEN LANG, Director, Office of Legal Access  :      MEMORANDUM OPINION
Programs,                              :              AND ORDER
                           Defendant.  :

----------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

Plaintiff Carlos Davila is the founder of A New Beginning for Immigrant's Rights, Inc. ("A New Beginning"), an immigrants' rights organization. Through A New Beginning, Davila participated in the Department of Justice's Recognition and Accreditation Program ("R&A Program"), which permitted him to represent individuals in immigration proceedings as a non-attorney. The Department of Justice revoked Davila's accreditation pursuant to new program requirements governing the eligibility of non-attorney representatives after they learned that he had been convicted of first-degree manslaughter in 1988.

Defendant Steven Lang is the Program Director of the Office of Legal Access Programs ("OLAP"), the federal entity tasked with administering the R&A Program. Davila seeks to hold Lang, in his official capacity, liable for injuries that Davila allegedly suffered as a result of his accreditation being terminated. Specifically, Davila contends that his termination from the program violated his constitutional right to due process and was arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 702 *et seq.* Davila further argues that OLAP's decision to terminate him on the basis of his criminal history violates New York Correction Law Articles 23 and 23-a. In his opposition, Davila newly asserts that (1) Lang and OLAP are not entitled to sovereign

immunity because the Government has consented to suit under the Religious Freedom Restoration Act; (2) Lang is not entitled to sovereign immunity because he is not a government employee; (3) Lang has defamed Davila; (4) OLAP's eligibility requirements for the R&A Program violate Title VII of the Civil Rights Act of 1964; and (5) Lang is barred from enforcing OLAP's revocation decision under the doctrines of equitable estoppel and laches.

Defendant Lang moved to dismiss all claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim on which relief may be granted. For the reasons that follow, Lang's motion to dismiss is GRANTED.

## I.   BACKGROUND

### A. Factual Background

The facts here are substantially the same as those set forth in related case *Davila v. Gutierrez et al.* No. 1:17-cv-5032 (GHW), 2018 WL 4189517 (S.D.N.Y. Aug. 30, 2018), which are restated in part below.

In 2011, Davila founded A New Beginning, an organization that provided assistance to undocumented immigrants regarding "the Protection of their Rights under the Constitution of the United States, Human Rights, and their Rights under the Vienna Convention." *Id.* at *1. Davila, through A New Beginning, participated in the Department of Justice's Recognition and Accreditation ("R&A") program from 2011 until 2017. Complaint (ECF No. 1-1) ("Compl.") at ¶¶ 10–11. The R&A program allows non-attorneys within non-profit organizations to act as authorized representatives for individuals in immigration proceedings before the Executive Office for Immigration Review ("EOIR") and the Department of Homeland Security ("DHS"). *See* 8 C.F.R. §§ 1001, 1003, 1103, 1212, and 1292 (2016). The Office of Legal Access Programs ("OLAP"), a component of the EOIR within the Department of Justice ("DOJ"), administers the R&A program.

*See* 8 C.F.R. §§ 1001, 1003, 1103, 1212, and 1292. Davila served as an accredited representative in the R&A program. *See* Compl. ¶ 10–12.

On December 19, 2016, DOJ published new regulations governing the R&A program. The new regulations transferred the administration of the program from the Board of Immigration Appeals to the Office of Legal Access Programs and promulgated modified eligibility criteria and procedures for the program. *See* 8 C.F.R. §§ 1001, 1003, 1103, 1212, 1292. Among the new rules promulgated was the eligibility requirement that an individual "[have] not been found guilty of, or pleaded guilty or nolo contendere to, a serious crime, as defined in 8 C.F.R. § 1003.102(h), in any court of the United States, or of any State. . . ." 8 C.F.R. § 1292.12(a)(5). Section 1003.102(h) defines a "serious crime" as any felony and certain enumerated misdemeanors.

Davila was convicted of manslaughter in the first degree in 1988. *See* Pl.'s Am. Opp'n to Def.'s Mot. to Dismiss (ECF. No. 14) ("Pl.'s Am. Opp'n") at 6. Upon learning of Davila's 1988 conviction, the Office of Legal Access Program sent A New Beginning a letter, dated May 10, 2017, terminating Plaintiff's R&A program accreditation pursuant to 8 C.F.R. § 1292.12(a)(5). Compl. at 3; Pl.'s Am. Opp'n at 6; Exhibits to Pl.'s Opp'n to Mot. to Dismiss (ECF No. 13) ("Exs. to Pl.'s Opp'n") at Ex. A.

### B. Procedural History

On July 5, 2017, Davila initiated *Davila v. Gutierrez et al.* against several reporters, news entities, and federal defendants. No. 1:17-cv-5032 (ECF No. 1). The federal defendants in *Gutierrez* included the named Defendant here, Program Director of the Office of Legal Access Programs Steven Lang, as well as the United States, Attorney General Jeff Sessions, Acting Director of the New York City District of United States Citizen and Immigration Services John Thompson, and United States Representative Nydia Velázquez. *Id.* In *Gutierrez,* Davila raised state law tort claims of defamation, intentional infliction of emotional distress, and invasion of privacy, as well as federal

constitutional and APA claims. *Gutierrez*, 2018 WL 4189517. On June 25, 2018, Davila voluntarily

dismissed his claims against Lang, Sessions, and Thompson pursuant to Fed. R. Civ. P.

41(a)(1)(A)(i). *Id.* Davila continued to pursue his claims against the remaining federal defendants.

*Id.*

On June 8, 2018, Davila commenced this action *pro se* in the Supreme Court of the State of

New York, County of Bronx against Lang, again raising claims that his termination from the R&A

program was arbitrary and capricious and in violation of his right to due process. Notice of

Removal (ECF No. 1); Ex. A to Removal, Compl. at ¶¶ 64–76. In addition, Davila newly contends

that OLAP's new policy of denying accreditation to persons with serious criminal convictions

violates New York Correction Law Article 23 and 23-a. Compl. ¶¶ 77–82.

On July 6, 2018, Lang removed the case to federal court. *See* Notice of Removal. On

August 3, 2018, Lang moved to dismiss the complaint. Def.'s Mot. to Dismiss (ECF No. 10–11)

("Def.'s Mem. of Law"). On August 17, 2018, Davila filed an opposition to the motion to dismiss,

with supporting exhibits. Pl.'s Opp'n to Def.'s Mot. to Dismiss (ECF No. 13) ("Pl.'s Opp'n"). On

August 20, 2018, Davila filed an amended version of his opposition brief, alleging new facts and

raising new legal arguments. Pl.'s Am. Opp'n to Def.'s Mot. to Dismiss (ECF. No. 14) ("Pl.'s Am.

Opp'n"). On August 27, 2018, Lang filed a reply. Def.'s Rep. to Pl.'s Opp'n to Def.'s Mot. to

Dismiss (ECF No. 15) ("Def.'s Rep.").

On August 29, 2018, the Court granted the United States' motion to dismiss in *Gutierrez*.

## II.    LEGAL STANDARD

"A court presented with a motion to dismiss under both Fed. R. Civ. P. 12(b)(1) and

12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion

is a decision on the merits, and therefore, an exercise of jurisdiction." *De Masi v. Schumer*, 608 F.

Supp. 2d 516, 523–24 (S.D.N.Y. 2009) (internal quotation marks and alterations omitted) (citing

*Homefront Org., Inc. v. Motz*, 570 F. Supp. 2d 398, 404 (E.D.N.Y. 2008); *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008)).

Pursuant to Rule 12(b)(1), the Court must dismiss a claim when it "lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted); *see also Arar*, 532 F.3d at 168 ("A federal court has subject matter jurisdiction over a cause of action only when it 'has authority to adjudicate the cause' pressed in the complaint." (quoting *Sinochem Int'l Co. v. Malay Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007))). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). When considering a motion made pursuant to Rule 12(b)(1), "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Raila v. United States*, 355 F.3d 118, 119 (2d Cir. 2004).

"[T]he United States, as sovereign, is immune from suit save as it consents to be sued." *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981) (internal quotation marks and citation omitted). The United States, therefore, "cannot be sued at all without the consent of Congress," and "when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed." *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983). "The doctrine of sovereign immunity is jurisdictional in nature, and therefore to prevail, the plaintiff bears the burden of establishing that her claims fall within an applicable waiver." *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citations omitted).

## A. Standard of Review Under Rule 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S at 678 (citing *Twombly*, 550 U.S. at 556). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 544).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 552 F.3d 122, 124 (2d Cir. 2008) (per curiam). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678–79, and courts need not give "credence to plaintiff's conclusory allegations." *Cantor Fitzgerald, Inc. v. Lutnick*, 313 F.3d 704, 709 (2d Cir. 2002) (internal quotation marks and citation omitted); *see also Twombly*, 550 U.S. at 561 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do.").

Because Davila is proceeding *pro se*, the Court must liberally construe the allegations in his complaint and "interpret[ ] [them] to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation omitted); *see also, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed . . . ." (internal quotation marks and citation omitted)); *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Where . . . the complaint was filed *pro se*, it must be construed liberally to raise the strongest claims it suggests." (quoting *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013))). Nevertheless, "dismissal of a *pro se* complaint is [ ] appropriate where a plaintiff has clearly failed to

meet the minimum pleading requirements." *Rahman v. Schriro*, 22 F. Supp. 3d 305, 310 (S.D.N.Y. 2014) (citing *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997)). Thus, the Court's "'duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it.'" *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (internal citations omitted).

In deciding this motion to dismiss, the Court considered documents that were either incorporated by reference into the complaint or integral to the claims asserted therein. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). For a document to be integral to a complaint, "the plaintiff must have (1) 'actual notice' of the extraneous information and (2) 'relied upon th[e] documents in framing the complaint.'" *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting *Chambers*, 282 F.3d at 153). While the Court must accept the facts as alleged in the complaint, "when any allegations contradict the evidence contained in the documents relied upon by a plaintiff, the documents control, and the Court need not accept the allegations contained within the complaint as true." *Rozsa v. May Davis Group, Inc.*, 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002).

Here, the Court considered the exhibit Davila submitted in connection with his Request for Administrative Review, which is integral to Davila's FTCA claims, and the termination letter Davila received from OLAP, which is integral to all of Davila's claims as they arise out of his termination from the R&A program. The Court has no trouble concluding that Davila had "actual notice" of these documents and relied on it in framing his complaint because he submitted these documents, along with others, as part of an appendix to his state court complaint, and again in connection with his opposition papers. *See generally* Compl.; Pl.'s Am. Opp'n; Exs. to Pl.'s Opp'n, Ex. A ("Termination Letter"). The Court also considered the relevant sections of the Federal Register in connection with Davila's APA, state law, and equitable estoppel and laches claims. *See* 44 U.S.C. § 1507 (permitting court to take judicial notice of the Federal Register's contents); *In re Frito-Lay N.*

*Am., Inc. All Natural Litig.*, No. 12-MD-2413, 2013 WL 4647512, at *4 (E.D.N.Y. Aug. 29, 2013) ("Courts are permitted to take judicial notice of the contents of the Federal Register and the Code of Federal Regulations and guidance from administrative agencies.").

## III. DISCUSSION

As an initial matter, Davila made new factual allegations and raised new claims for the first time in his opposition to Lang's motion to dismiss. Because Davila is proceeding *pro se*, the Court may consider new facts raised in opposition papers to the extent that they are consistent with the complaint, treating the new factual allegations as amending the original complaint. *See Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion."); *Brooks v. Jackson*, No. 11-cv-6627, 2013 WL 5339151, at *3 (S.D.N.Y. Sept. 23, 2013) ("[B]ecause a *pro se* plaintiff's allegations must be construed liberally, it is appropriate for a court to consider factual allegations made in a *pro se* plaintiff's opposition memorandum, as long as the allegations are consistent with the complaint.").

A *pro se* plaintiff may not raise "entirely new" causes of action for the first time in his opposition papers, but the Court may consider new claims appearing for the first time in briefing if "the claims could have been asserted based on the facts alleged in the complaint." *Vlad-Berindan v. MTA New York City Transit*, No. 14-cv-675, 2014 WL 6982929, at *5 (S.D.N.Y. 2014) (citing *Rosado v. Herard*, No. 12-cv-8943, 2013 WL 6170631, at *3 (S.D.N.Y. 2013)); *see also Lang v. New York City Health and Hospitals Corp.*, No. 12-cv-5523, 2013 WL 4774751, at *4 (S.D.N.Y. Sept. 5, 2013) (considering new claims raised in opposition papers because the allegations "simply articulat[e] additional claims that [the *pro se* plaintiff's] original complaint could have been construed to allege") *see also Mathie v. Goord*, 267 Fed. App'x 13, 14, 2008 WL 89648, at *1 (2d Cir. 2008) (affirming that a new constitutional challenge raised in opposition briefing was properly dismissed because the

complaint did not "encompass that claim."); *Mira v. Argus Media*, No. 14-cv-675, 2017 WL 1184302, at *3 (S.D.N.Y. 2017) (declining to review claims raised in a *pro se* plaintiff's opposition briefing because the allegations went "well beyond merely elaborating on the facts alleged in the Complaint and apparently are intended to support new legal theories.").

## A. Davila Cannot State a Claim Under the Religious Freedom Restoration Act

In Davila's opposition, he raises for the first time the argument that the United States has consented to suit under the Religious Freedom Restoration Act ("RFRA"). Liberally construed, the Court interprets this claim as alleging that OLAP's revocation of Davila's accreditation violated RFRA. In his complaint, Davila refers to A New Beginning's status as a religious entity, stating that it participated in the R&A Program as a "qualified," religious non-profit organization. Compl. at 1–2. Davila asserts that he is a clergy member who formed A New Beginning, a "God guidance [sic] ministry," after "the Lord Jesus[] gave [him] a vision" showing him that he was chosen to help undocumented immigrants. Am. Opp'n at 21–22. These newly alleged facts go beyond the facts in the Complaint and raise an entirely new legal theory. However, even if the Court could consider Davila's RFRA claim, the claim would fail.

"Under RFRA, the Federal Government may not, as a statutory matter, substantially burden a person's exercise of religion. . . ." *O Centro Espirita*, 546 U.S. 418, 424 (2006); *see* 42 U.S.C. § 2000bb–3(a); *Grief v. Quay*, 701 F. App'x 64 (2d Cir. 2017) ("To state a claim under the Religious Freedom Restoration Act (RFRA), a plaintiff must allege that there is a substantial burden on the exercise of her sincere religious beliefs."). "[A] substantial burden exists where the [government] put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Newdow v. Peterson*, 753 F.3d 105, 109 (2d Cir. 2014) (internal quotation marks omitted).

However, even construing Davila's submissions liberally, his claim that he is entitled to relief under RFRA still fails. Davila does not plead any facts that demonstrate how OLAP's promulgation

of the new eligibility requirements, or the revocation of his accreditation, have substantially burdened his ability to freely exercise his religion. His allegations about his religion, and his conclusory statement that Lang "interrupt[ed] and interfere[d] [with] Plaintiff's ministry," are insufficient to state a claim.

## B. The *Clearfield Trust* Doctrine is Inapplicable

In his opposition, Davila newly contends that Lang is not entitled to sovereign immunity under the *Clearfield Trust* doctrine because he is "not a Federal Employee, but a mere private citizen working as a Program director of a Corporation." Am. Opp'n at 20–21. "The primary doctrine derived from *Clearfield* is that federal common law will displace state law, and can be created by federal courts, only when 'uniquely federal interests' are involved and the application of state law would 'significantly conflict' with federal policy or objectives." *In re Sterling*, 565 B.R. 258, 265 (S.D.N.Y. 2017), *aff'd*, No. 17-949, 2018 WL 4354399 (2d Cir. Sept. 12, 2018).

Davila's argument under the *Clearfield Trust* doctrine argument suffers from a number of flaws, both substantive and procedural.[1] But fundamentally, the *Clearfield Trust* doctrine is inapplicable to this case. Confronted with a *pro se* litigant who asserted that the *Clearfield Trust* doctrine deprived the United States of sovereign immunity, another court in this District recently explained:

> [T]he *Clearfield Trust* Doctrine does not constitute a waiver of sovereign immunity. In *Clearfield Trust v. United States*, 318 U.S. 363, 366–67 (1943), the Supreme Court held that federal law governs questions concerning the rights of the federal government under

---

[1] The three paragraphs in Davila's opposition that he represents to be quotations from *Clearfield Trust Co. v. United States* do not appear in that case, or in any of the internal citations within the ostensibly quoted language. Compare Am. Opp'n at 20 with *Clearfield Tr. Co. v. United States*, 318 U.S. 363 (1943). In addition, the Court notes that this basis for liability was raised for the first time in Davila's opposition briefing. This new theory and the related factual allegations with respect to it set forth in Davila's opposition contradict the legal theories and facts on which Davila relied in his complaint, many of which demonstrate that OLAP is a federal entity under the direction of the Department of Justice. See e.g., Compl. ¶ 76 ("Due process liberty interest at stake [sic] where the government has damaged a person's reputation In [sic] the process of taking significant action against that person. . . ."). The Court addresses the argument on the merits, nonetheless.

> federal programs, such that, in the absence of an act of Congress
> applicable to the functioning of such programs, the federal courts
> may fashion an appropriate and governing rule of law according to
> their own standards. . . .  Like nearly every other authority cited by
> Plaintiff, *Clearfield Trust* has no application to any issue in this case.

*In re Sterling*, 565 B.R. at 265 (citation omitted), *aff'd*, No. 17-949, 2018 WL 4354399.  The reasoning

of the Court in *In re Sterling* applies with equal force here.  Davila's claim that Lang is not entitled to

sovereign immunity by operation of the *Clearfield Trust* doctrine is without merit.

### C.  The FTCA Bars Davila's Claims Against Lang in His Individual Capacity

In his opposition papers, Davila alleges new facts that, liberally construed, raise a defamation

claim against Lang and OLAP.  Davila asserts that employers "were reluctant to hire him because of

the publicity and implications of the media report that were televise[d] [worldwide] and published

[o]n the internet regarding OLAP termination of Plaintiff in it[s] program."  Pl.'s Am. Opp'n at 13.

As a result of employers' hesitancy to hire him, Davila claims that he is "broke, without

employment, emotionally sick and in a state of anxiety."  *Id.*  Because these new allegations are

consistent with the facts in Davila's complaint, they may be considered in deciding this motion to

dismiss.  See *Rosado*, 2013 WL 6170631, at *3 ("This extension of the usual principles applicable to a

Rule 12(b)(6) motion applies to factual allegations that are consistent with those contained in the

complaint."); *see also Vlad-Berindan*, 2014 WL 6982929, at *6 ("[T]o the extent claims alleged for the

first time in motion papers could have been asserted based on the facts alleged in the complaint,

they should be considered.").

This claim is substantially similar to Plaintiff's defamation claims in *Gutierrez*.  For the same

reasons stated in *Gutierrez*, and restated below, Davila's claim that Lang defamed him is barred by

sovereign immunity.

The Federal Tort Claims Act ("FTCA") "'constitutes a limited waiver by the United States of

its sovereign immunity and allows for a tort suit against the United States under specified

circumstances.'" *Liranzo v. United States*, 690 F.3d 78, 85 (2d Cir. 2012) (quoting *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007)). Specifically, the FTCA waives the sovereign immunity of the United States with respect to:

> claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

Furthermore, the FTCA immunizes federal employees from all liability for any negligent or wrongful acts or other common law tort claims committed while acting within the scope of their employment. *See* 28 U.S.C. § 2679(b)(1); Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, § 2(b), 102 Stat. 4563, 4564 (1988) (noting that purpose of the Act is to protect federal employees form personal liability for state law torts committed within scope of their employment); *see Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 80 (2d Cir. 2005) ("The FTCA's purpose is both to allow recovery by people injured by federal employees or by agents of the Federal Government, and, at the same time, to immunize such employees and agents from liability for negligent or wrongful acts done in the scope of their employment."). The FTCA provides the exclusive remedy for damages resulting from such claims. 28 U.S.C. § 2679(b)(1).

Pursuant to the FTCA, when an employee of the United States or a federal agency is named as a defendant in a tort action, "[u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States . . . and the United States shall be

substituted as the party defendant." 28 U.S.C. § 2679(d)(1). However, "[a]n express petition for certification [by the Attorney General] is not required and a brief on behalf of the named defendants may serve as a petition to certify that they were employees acting within the scope of their employment." *Cates v. Williams*, No. 08-cv-1529, 2009 WL 723021, at *5 (S.D.N.Y. Mar. 19, 2009) (citing *B&A Marine Co., Inc. v. Am. Foreign Shipping Co., Inc.*, 23 F.3d 709, 715–16 (2d Cir. 1994)).

"Even an Attorney General's certification that a federal employee was acting within the scope of his employment . . . does not conclusively establish as correct the substitution of the United States as defendant in place of the employee, however." *Tomscha v. Poole*, No. 16-cv-1263, 2016 WL 7378974, at *6 (S.D.N.Y. Dec. 20, 2016) (internal quotation marks omitted) (citing *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995)). "A court must conduct a *de novo* review of a 28 U.S.C. § 2679(d) certification by the Attorney General (or his designee) if a plaintiff alleges with particularity facts relevant to the scope-of-employment issue." *Id.* (internal quotation marks and alterations omitted) (citing *United States v. Tomscha*, 150 Fed. App'x 18, 19 (2d Cir. 2005)). "The court must view the tortious conduct in the light most favorable to plaintiff, but . . . makes its own findings of fact with respect to the scope of the tortfeasor's employment and, in so doing, . . . may rely on evidence outside the pleadings." *Id.* (citing *Bello v. United States*, 93 Fed. App'x 288, 289–90 (2d Cir. 2004)).

Here, the United States has submitted its certification on behalf of Lang through its motion, rather than by formal petition. *See* Def.'s Mem. of Law at 10. The Court does not find that Plaintiff has pleaded with particularity facts relevant to the scope-of-employment issue such that the Court is obligated undertake a *de novo* review of the United States' certification. *See id.* (finding that *pro se* plaintiff's bald assertions that the United States acted with malice were not sufficient to require the court to undertake a *de novo* review of the United States' certifications); *Regnante v. Sec. & Exch. Officials*, 134 F. Supp. 3d 749, 770 (S.D.N.Y. 2015) (declining to undertake *de novo* review of United

States' certification where *pro se* plaintiff did not plead sufficient facts to suggest that defendants were acting outside the scope of their employment). Davila did not plead any facts suggesting that Lang was acting outside the scope of his employment. Accordingly, the Court substitutes the United States for Lang.

### D. Davila's Claims Against the United States Are Barred by Sovereign Immunity

Davila's defamation and constitutional claims against the United States must be dismissed because they are barred by sovereign immunity, and the federal government has not waived immunity for either of those types of claims. "The United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *Liranzo*, 690 F.3d at 84 (internal quotation marks and ellipses omitted) (quoting *United States v. Mitchell*, 445 U.S. 535, 538 (1980)). "When an action is brought against the United States government, compliance with the conditions under which the government has agreed to waive sovereign immunity is necessary for subject matter jurisdiction to exist." *Williams v. United States*, 947 F.2d 37, 39 (2d Cir. 1991), *cert. denied,* 504 U.S. 942 (1992); *see Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 474–75 (1994) (holding that sovereign immunity raises jurisdictional bar to suit). Even if an action against the federal government is the only possible remedy a plaintiff may have for torts by federal employees, the action cannot be brought if the United States has not explicitly waived sovereign immunity for such claims. *See B&A Marine Co.*, 23 F.3d 709, 714–15.

Because the United States has not waived its sovereign immunity for defamation claims, Davila's claim is barred. 28 U.S.C. § 2680(h) (explicitly excluding claims of slander from waiver of immunity); *B&A Marine Co.*, 23 F.3d at 709 (holding that the lower court properly dismissed the United States because the United States has not waived immunity for defamation claims). While the FTCA provides a limited waiver of sovereign immunity for certain tort claims, Congress has not

waived the United States' sovereign immunity with respect to constitutional tort claims. *See FDIC v. Meyer*, 510 U.S. 471, 478 (1994) ("[T]he United States simply has not rendered itself liable . . . for constitutional tort claims."); *Chen v. United States*, 854 F.2d 622, 625–26 (2d Cir. 1988) (holding that government's waiver of sovereign immunity under the FTCA does not extend to claims based on "direct violations of the Federal Constitution . . . or of federal statutes or regulations standing alone"). Constitutional claims not brought as a *Bivens* action against individual federal defendants must be dismissed for lack of subject matter jurisdiction. *Id.*

### E. Davila Failed to Comply with the FTCA's Procedural Requirements

"The FTCA requires that a claimant exhaust all administrative remedies before filing a complaint in federal district court. This requirement is jurisdictional and cannot be waived." *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005) (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)). The requirement also "applies equally to litigants with counsel and to those proceeding *pro se.*" *Adeleke v. United States*, 355 F.3d 144, 153 (2d Cir. 2004). Before bringing a claim against the United States for money damages for injury or loss of property caused by an employee or agent of the United States acting within the scope of his or her employment, the plaintiff must first present the claim to the appropriate federal agency, and the agency must either deny the claim or six months need to have elapsed since the plaintiff submitted the claim. 28 U.S.C. § 2675(a). "Claims against the United States are forever barred unless they are presented in writing to an appropriate federal agency within two years after the claim accrued." *Accolla v. U.S. Gov't*, 636 F. Supp. 2d 304, 307 (S.D.N.Y. 2009) (citing 28 U.S.C. § 2401(b)). The plaintiff has the burden to plead compliance with the exhaustion requirement. *Accolla*, 636 F. Supp. 2d at 307 (citing *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 189 (2d Cir. 1999)). If the plaintiff fails to first present his claim to the appropriate agency and exhaust administrative remedies, then the

plaintiff's tort claim must be dismissed for lack of subject matter jurisdiction. *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) (citing *McNeil*, 508 U.S. at 113).

Davila has not pleaded compliance with the exhaustion requirement in accordance with 28 U.S.C. § 2401(b). There is no indication that Davila ever presented the tort claims at issue in this action to any federal agency. The only items that Davila appears to have submitted in connection with this matter are a United States Postal Service receipt and tracking sheet related to a mailing to Lang that enclosed a "Request for Administrative Review." Compl. ¶¶ 16–17; Exs. to Pl.'s Opp'n at Ex. B. Nowhere does Davila plead that he presented the defamation claim raised in this action. Even drawing all reasonable inferences in favor of Davila, the Court cannot conclude that the request was a presentation of the claim to the appropriate agency. As such, Davila has failed to exhaust all administrative remedies, and his tort claim must be dismissed for lack of subject matter jurisdiction. *Robinson*, 21 F.3d at 510.

### E.  Davila's *Bivens* Claims Fail Because They Differ Meaningfully from Prior *Bivens* Claims and Special Factors Counsel Hesitation

Davila's *Bivens* claim are substantially the same as those set forth in *Gutierrez*. For the same reasons set forth in *Gutierrez* and restated below, these claims must fail.

Constitutional tort claims must be brought against individual federal agents or employees in their individual capacities through a *Bivens* action. *See e.g.*, *Robinson*, 21 F.3d at 510. The Court construes Davila's Fourteenth Amendment claims as *Bivens* claims. In *Bivens v. Six Unknown Named Agents*, the Supreme Court held that a plaintiff had an implied private right of action for damages against federal officers who violated the plaintiff's Fourth Amendment rights against unreasonable search and seizure when they handcuffed him inside his home without a warrant. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). In the more than forty years since that decision, the Supreme Court has created a new implied right of action in only two other cases:  (1) under the Fifth Amendment's due process clause for gender discrimination arising out of a Congressman's firing of

his female secretary, *Davis v. Passman*, 442 U.S. 228 (1979), and (2) under the Eighth Amendment's cruel and unusual punishment clause arising out of prison officials' failure to treat an prisoner's asthma, which resulted in the prisoner's death, *Carlson v. Green*, 446 U.S. 14 (1980).

In a recent decision, the Supreme Court underscored that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). That is because "[w]hen an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them." *Id.* at 1857 (citing *Bush v. Lucas*, 462 U.S. 367, 380 (1983)) (internal quotation marks omitted). In *Ziglar*, the Court re-emphasized that the creation of a new private right of action under *Bivens* must be carefully scrutinized.

As the Supreme Court has instructed, this careful scrutiny requires courts to engage in a process to determine whether it is appropriate for the Judiciary to extend a *Bivens* remedy to the claims of a particular case. A court must first determine whether the claim "presents a new *Bivens* context." *Id.* at 1859. A new *Bivens* context will exist "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by this Court." *Id.* The Court presented a non-exhaustive list of considerations to examine if a case is meaningfully different, including:

> [T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk or disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860.

If the court determines that the claim at issue differs meaningfully from previous *Bivens* cases, the court must then determine if it is appropriate to imply a new private right of action to that claim. In *Ziglar,* the Supreme Court affirmed the long-held precedent that a *Bivens* remedy "will not

be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" *Ziglar,* 137 S. Ct. at 1857 (citing *Carlson,* 446 U.S. at 18).

Davila's claims here are meaningfully different from prior *Bivens* cases, and special factors counsel hesitation. Unlike *Bivens* and *Carlson,* Davila's claims did not include any form of search and seizure under the Fourth Amendment, nor did his claims include anything that could be construed to constitute cruel and unusual punishment towards Davila. While the *Bivens* action brought in *Davis* included a due process claim under the Fifth Amendment, that claim was substantially different than the due process claim brought by Davila under the Fourteenth Amendment. The claim in *Davis* related to gender discrimination in the workplace, whereas the claim in the instant case relates to the revocation of a government accreditation. Thus, Davila's due process claims under the Fourteenth Amendment implicate a new context for the application of a *Bivens* remedy.

Because Davila's claim presents a new *Bivens* context, the Court must analyze whether special factors counsel hesitation in expanding *Bivens* "in the absence of affirmative action by Congress." *Id.* The Supreme Court in *Ziglar* explained that the "special factors" inquiry "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed. Thus, to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* at 1857–58. That is, a court begins with the premise that the Judiciary should not readily extend a *Bivens* remedy to new claims, and before a court does so, it should consider a number of factors to determine whether "Congress would want the Judiciary to entertain a damages suit in a given case." *Id.* Among those factors is whether alternative remedies exist for addressing the constitutional violations raised by the claims of a particular case. The Supreme Court suggested that "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.*

In this case, Davila asserts a claim under the due process clause of the Fourteenth Amendment. However, there is an alternative remedial structure in place. The letters that OLAP sent to Davila to inform him of A New Beginning's termination from the R&A program explicitly provided that Davila had "the opportunity to respond to this notice prior to the termination of full accreditation." Termination Letter. This alone counsels hesitation in extending a *Bivens* remedy here.

Because Davila's claims present a new *Bivens* context, and special factors counsel hesitation, the Court declines to recognize a *Bivens* remedy for Davila's Fourteenth Amendment claims.

### F. The Revocation of Davila's Accreditation Did Not Violate the Due Process Clause of the Fourteenth Amendment

Davila's due process claim is substantially similar to his claim brought in *Gutierrez*. For the same reasons stated in *Gutierrez* and restated below, this claim is dismissed.

Even if Davila's due process claim could be pursued as a *Bivens* claim, there is no underlying due process violation for which a *Bivens* action against Lang or any other action against the United States could provide a remedy. To succeed on a procedural due process claim, a plaintiff must establish that some government action deprived him of a protected property interest. *Morales v. New York*, 22 F. Supp. 3d 256, 276 (S.D.N.Y. 2014) ("'The threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution.'" (quoting *Narumanchi v. Bd. of Trs.*, 850 F.2d 70, 72 (2d Cir. 1988))). The "identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest . . . and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (citing *Goldberg v. Kelly*, 397 U.S. 254, 263–71 (1970)).

When a government program grants substantial discretion to decide whether an individual is entitled to a benefit, the existence of such discretion precludes any legitimate claim of entitlement. *See Spinelli v. City of New York*, 579 F.3d 160, 169 (2d Cir. 2009); *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 504–05 (2d Cir. 2001); *Sanitation & Recycling Indus. v. City of New York*, 107 F.3d 987, 995 (2d Cir. 1997).

The broad discretion afforded to those who implement the R&A program precludes any "legitimate claim of entitlement" that Davila would need for a successful due process claim. The governing regulations of the R&A program state that "[t]he [Office of Legal Access Programs] Director, *in the exercise of discretion*, *may* approve accreditation of an eligible individual as a representative of a recognized organization. . . ." *See* 8 C.F.R. § 1292.12(a) (emphasis added). Further, such discretion includes the Director's assessment of the eligible individual's "character and fitness to represent clients," including:

> [A]n examination of factors such as: Criminal background; prior acts involving dishonest, fraud, deceit or misrepresentation; past history of neglecting professional, financial, or legal obligations; and current immigration status that presents an actual or perceived conflict of interest.

*See* 8 C.F.R. § 1292.12(a)(1).

Not only is "discretion" explicitly written into the program's guidelines, the ability to consider such a broad array of factors demonstrates the extent of discretion that the R&A program administrators have in granting accreditation. Because the R&A program guidelines confer such broad discretion, Davila lacks a legitimate claim of entitlement to accreditation under the R&A program. Without a legitimate claim of entitlement, Davila does not possess a property interest in his accreditation under the R&A program. Therefore, Davila fails to state a claim for a procedural due process deprivation.

### G. Davila's Termination from the R&A Program Was Not Arbitrary and Capricious

Davila's contention that the withdrawal of his accreditation from the R&A program was arbitrary and capricious fails for the same reasons stated in *Gutierrez* and restated below.

Under the APA, a reviewing court must hold unlawful any decision or action taken by a federal agency that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the arbitrary and capricious standard, judicial review of agency action is necessarily narrow, and a reviewing court may not itself weigh the evidence or substitute its judgment for that of the agency. *Islander E. Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 150–51 (2d Cir. 2008) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983)). "Rather, in deciding whether agency action is arbitrary and capricious, a court considers 'whether the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (quoting *State Farm*, 463 U.S. at 43). In conducting its arbitrary and capricious review, a court must be satisfied from the record that "the agency . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *State Farm*, 463 U.S. at 43.

Davila asserts that his termination from the program was arbitrary and capricious because 8 C.F.R. § 1003.103(c), which he cites as the basis for his termination, requires accredited representatives to disclose convictions occurring on or after August 28, 2000, while Davila was terminated on the basis of his 1988 conviction for manslaughter. The Court understands that Davila may be confounded in part by this apparent incongruity—*i.e.* that Davila was only required to disclose convictions occurring after August 28, 2000, and yet was terminated on the basis of a conviction that occurred before that date.

Davila may have initially been required to disclose only convictions occurring after August 28, 2000 pursuant to 8 C.F.R. § 1003.103(c), but Davila's accreditation was revoked pursuant to the modified rules governing the R&A program that were published on December 19, 2016, after Davila received accreditation. Termination Letter. By letter dated May 10, 2017, OLAP informed Davila that it was administratively terminating his accreditation because it had learned that he was convicted of a felony, which rendered him ineligible under the program's modified rules. *Id.* The modified rules provide that "[t]he OLAP Director may administratively terminate an organization's recognition or a representative's accreditation and remove the organization or representative from the recognition and accreditation roster" if, *inter alia*, "[a]n individual fails to maintain eligibility for accreditation under § 1292.12." 8 C.F.R. § 1292.17. Section 1292.12 provides that individuals are not eligible for accreditation under the R&A program if they have "been found guilty of, or pleaded guilty or *nolo contendere* to, a serious crime, as defined in 9 C.F.R. § 1003.102(h). . . ." 8 C.F.R. § 1292.12(a)(5); *see also* 8 C.F.R. § 1292.12(a)(1) (character and fitness includes but is not limited to criminal background); Compl. at ¶¶ 38, 41; Termination Letter. Section 1003.102(h) defines a "serious crime" as any felony. It is undisputed that Davila pleaded guilty to a felony—first-degree manslaughter. Davila's confusion regarding this apparent incongruity is understandable, but it does not make the modified rule or rulemaking process arbitrary or capricious, as discussed in more detail below.

Giving Davila's *pro se* amended complaint a liberal construction, the Court understands Davila also to be challenging the retroactive application of the applicable regulation.[2] However, it is

---

[2] It is not clear that Davila's complaint can be construed as making the argument that DOJ promulgated the new eligibility requirements in an arbitrary and capricious manner. To the extent that it is, the Court notes that DOJ published in the Federal Register the proposed rule on October 1, 2015. 80 Fed. Reg. 59514. DOJ received 63 comments from various sources, including non-profit organizations, bar associations, government agencies, legal clinics, attorneys, and law students, and in response to those comments, DOJ revised the proposed rule. 81 Fed. Reg. 92346. DOJ articulated at length the bases for its rulemaking, including stating specifically that "[r]egarding those convicted of a serious crime, this prohibition supplements the character

evident that the modified rules governing the R&A program's accreditation procedure envision retroactive application.  The provision within the modified guidelines requiring disclosure that Davila cites is limited only to events occurring after August 28, 2000, and the modified provisions in Section 1292.12(a)(5)—the section under which Davila was terminated—contain no such time limit. From the lack of such a time limit, the Court can infer that the modified guideline was intended to apply to any "serious crimes" committed by the individual at any time, even those which occurred prior to the enactment of the new guidelines in December 2016.  Because the plain language of the applicable regulation, which envisions retroactive application, allows OLAP to terminate a person who has been convicted of a felony, and OLAP terminated Davila because he was convicted of a felony, as set forth in the May 10, 2017 letter to Davila, the Court concludes that OLAP examined the relevant data and articulated a satisfactory explanation for its action.  *See State Farm*, 463 U.S. at 43.  Accordingly, Davila has failed to state a claim under Section 706(2)(A) of the APA.

### H. Claims Arising Under the New York Correction Law

Davila's claims arising under the New York Correction Law fail because the laws that he cites do not govern federal administrative bodies like OLAP, and even if they did, they would be preempted by the applicable federal regulations.  Davila alleges that in failing to consider his certificate of good conduct from the New York Board of Parole, and by promulgating and enforcing

---

and fitness requirement, as the Department has determined that individuals with serious crimes are not qualified to be accredited.  Unlike with attorneys permitted to appear before EOIR and DHS, the Department has the authority to decide whether nonlawyers should be accredited and permitted to provide immigration legal services in the first instance and need not be limited to pursuing discipline against them based on a serious crime after they have been accredited."  81 Fed. Reg. 92353.  In light of this notice-and-comment rulemaking and the explanations that DOJ provided for the new eligibility requirements, Davila has failed to state a claim that DOJ's promulgation of the new eligibility criteria was arbitrary or capricious.  *See generally Chauffeur's Training School v. Spellings*, 478 F.3d 117, 130 (2d Cir. 2007) ("Ordinarily, agency decisions are not found to be arbitrary and capricious unless the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  (internal citations and quotations omitted)).

the 2016 change to its accreditation policy, OLAP violated Articles 23 and 23-a of the New York Correction Law. Compl. ¶¶ 77–82. Those articles of the New York Correction Law provide that criminal convictions may not be considered in connection with licensing applications without the consideration of additional employment-related factors, and that a certificate of good conduct relieves an individual of disabilities imposed by prior convictions. *See* N.Y. Correct. Law Ch. 43, art. 23, 23-a. But the language of Articles 23 and 23-a clearly establishes that the state statute does not purport to constrain the actions of federal administrative bodies like OLAP.

Article 23-a, by its plain language, restricts its applicability to certificates, licenses, permits, or grants of permission required by the state of New York. Article 23-a provides in part that:

> No application for any license or employment, and no employment
> or license held by an individual, to which the provisions of this article
> are applicable, shall be denied or acted upon adversely by reason of
> the individual's having been previously convicted of one or more
> criminal offenses, or by reason of a finding of lack of "good moral
> character" when such finding is based upon the fact that the
> individual has previously been convicted of one or more criminal
> offenses, unless:
>
>> (1) there is a direct relationship between one or more of the
>> previous criminal offenses and the specific license or
>> employment sought or held by the individual; or
>>
>> (2) the issuance or continuation of the license or the granting
>> or continuation of the employment would involve an
>> unreasonable risk to property or to the safety or welfare of
>> specific individuals or the general public.

N.Y. Corr. § 752. In making determinations pursuant to Section 752, public agencies and private employers are required to consider several employment-related factors, and, if applicable, a certificate of good conduct. N.Y. Corr. § 753. Article 23-a is inapplicable in this matter because the statute defines a "license" as "any certificate, license, permit or grant of permission required *by the laws of this state*, its political subdivisions or instrumentalities . . . ." N.Y. Corr. § 750(4) (emphasis added). The R&A Program is not a creation of New York state law.

24

In addition, by its terms, Article 23-a constrains the behavior of state and local governmental entities, but not federal agencies. Article 23-a governs how a "public agency or private employer" may consider prior criminal convictions, and how Article 23-a may be enforced against a "public agency" or "private employer." See N.Y. Correct. Law §§ 753–755. The statute defines "public agency" as "the *state or any local* subdivision thereof, or any *state or local* department, agency, board or commission." N.Y. Correct. Law § 750(1) (emphasis added). Because OLAP is a federal—not state or local—body, Article 23-a does not govern its conduct.

Similarly, New York Correction Law Article 23 does not apply here because it governs the effect of a certificate of good conduct issued in connection with *state* licensing, and because it directs licensing authorities to consider prior convictions in accordance with Article 23-a. Article 23 provides that convictions specified in a certificate of good conduct "shall not be deemed to be a conviction within the meaning of any provision of law that imposes a disability to apply for or to receive any *license*, permit, or other authority or privilege covered by the certificate," and specifies that "[a] certificate of good conduct shall not, however, in any way prevent any judicial administrative, licensing or other body, board or authority from considering the conviction specified therein in accordance with the provisions of article twenty-three-a of this chapter." N.Y. Correct. Law § 703-a(1)–(2) (emphasis added).

As discussed above, the term "license" only includes "any certificate, license, permit or grant of permission" required by the laws of the State of New York. N.Y. Corr. § 750(4). In addition, Article 23 permits a judicial administrative, licensing or other body, board or authority to consider a conviction "in accordance with the provisions of article twenty-three-a of this chapter," and Article 23-a only applies to state and local entities by operation of the terms "public agency" and "license," as described above. N.Y. Corr. §§ 750, 753. Because OLAP acts as a federal licensing body and

determines whether to grant accreditation to individuals pursuant to federal regulations, the language of Article 23 does not govern the OLAP's conduct.

### a. Federal Preemption of State Law

To the extent that Articles 23 and 23-a purport to govern OLAP's accreditation process, the applicable federal regulations preempt Articles 23 and 23-a. The Supremacy Clause of Article VI of the Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . ." U.S. Const. art. VI, cl. 2. Federal regulations are given the same preemptive effect as federal statutes. *Fidelity Federal Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153–54 (1982). Under the Supremacy Clause, a federal agency may preempt state law when it is acting within the scope of its congressionally delegated authority. *See United States v. Shimer*, 367 U.S. 374, 381–82 (1961) ("A federal statute authorizing an administrative agency to promulgate such rules and regulations, not inconsistent with the statute as are necessary and appropriate for carrying out the provisions of the statute, authorizes the agency to displace state law by establishing a uniform system of exclusive procedures."); *see also City of N.Y. v. F.C.C.*, 486 U.S. 57, 64 (1988) ("The statutorily authorized regulations of an agency will preempt any state or local law that conflicts with such regulations or frustrates the purposes thereof.").

Federal law may displace state law through express or implied preemption. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Absent express statutory language, federal law may preempt state law by occupying the entire field, where the federal scheme is "so pervasive as to make reasonable the inference that Congress left no room for state law to supplement it" or when a "federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* Alternatively, federal law may displace state law through conflict preemption "when compliance with both state and federal law is impossible, or when the

state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *SPGGC, L.L.C. v. Blumenthal*, 505 F.3d 183, 188 (2d Cir. 2007).

The federal government has occupied the field of immigration proceedings, which includes determining the eligibility of persons who wish to serve as legal representatives in immigration courts. Congress's intent to supersede state law in the field of immigration proceedings can be inferred by the federal interest in regulating immigration and by the comprehensive statutory language surrounding immigration administration. The Supreme Court has observed that "the power of [C]ongress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications." *Kleindienst v. Mandel*, 408 U.S. 753, 766–67 (1972) (quoting *Galvan v. Press*, 347 U.S. 522, 531–32 (1954)). The Supreme Court has also recognized that the federal government exercises supreme power in the field of foreign affairs, including "immigration, naturalization and deportation" and that any concurrent state power is extremely narrow. *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941).

OLAP, under the authority of the Department of Justice and the Executive Office for Immigration Review ("EOIR") is given the authority to develop and administer the accreditation program for representatives before the BIA, the Immigration Courts, or DHS. 8 C.F.R. § 1003.0. Lang, as the director of OLAP, has the sole authority to make determinations regarding the approval and termination of non-attorney accreditation. 8 C.F.R. §§ 1003.0, 1292.13, 1292.17. Lang has the sole authority to interpret the provisions governing accreditation applicant eligibility, including character and fitness factors such as the existence of prior convictions. 8 C.F.R. §§ 1292.6, 1292.11. The regulations governing non-attorney accreditation are ample and do not leave room for states to weigh in on the review procedures for accreditation candidates. Because the accreditation rules were

promulgated by proper exercise of agency authority, state laws have no bearing on the creation and enforcement of OLAP regulations.

Further, even if Articles 23 and 23-a did purport to restrain federal agencies, the statutes would be in direct conflict with OLAP's regulations and would therefore be preempted. Pursuant to the Supremacy Clause, a federal regulation controls when there is "significant conflict between . . . federal policy or interest and the [operation] of state law," even when Congress has not completely displaced state regulation in a specific area. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) (internal citations omitted). A conflict arises when "compliance with both federal and state regulations is a physical impossibility." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, (1963). The Supreme Court has also concluded that a conflict requiring federal preemption exists where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. 52, 67 (1941).

Davila contends that OLAP is required to consider his certificate of good conduct in its accreditation decision, arguing that the possession of such a certificate "trumps any [employment] barrier" established by OLAP. Compl. at 17. This interpretation of Articles 23 and 23-a conflicts directly with the applicable regulations, which explicitly state that prior convictions of a serious crime render an applicant ineligible for accreditation. 8 C.F.R. § 1292.12(a)(5). The regulation further provides that the provision barring the accreditation of individuals convicted of a serious crime "supplements the character and fitness requirement, as the Department has determined that individuals with serious crimes are not qualified to be accredited." 81 Fed. Reg. 92351. To the extent that the New York Correction law could be read to "trump any barrier" established by OLAP, as Davila suggests, complying with both the federal and state laws would be a "physical impossibility," and the federal regulation would preempt the applicable state laws.

Accordingly, Davila's claim under Articles 23 and 23-a of the New York Correction Law is dismissed.

## I.   Title VII Claim

Davila's Title VII claim fails because he is not an employee of OLAP.  Davila argues that by revoking his accreditation solely on the basis of his prior conviction, OLAP violated of Title VII of the Civil Rights Act of 1964.  While this is a new legal claim appearing for the first time in Plaintiff's opposition papers, Plaintiff relies on factual assertions alleged in his complaint to support his claim. Therefore, the Court will consider his Title VII claim.

Title VII of the Civil Rights Act of 1964 makes it unlawful "for an employer . . . to discharge any individual, or otherwise . . . discriminate," on the basis of the individual's race, color, religion, sex or national origin.  42 U.S.C. § 2000e-2(a)(1).  To survive a motion to dismiss on a Title VII claim, the Plaintiff must establish that an employment relationship exists between the Plaintiff and Defendant.  *See Kern v. City of Rochester*, 93 F.3d 38, 45 (2d Cir. 1996) ("Title VII is an *employment* law, available only to employees (or prospective employees) seeking redress for the unlawful employment practices of their employers." (emphasis in original)).  To determine whether an employment relationship exists, courts look to several factors that relate to whether the "employer compensates and controls an employee's work."  *Nelson v. Beechwood Org.*, 2004 WL 2978278, at *3 (S.D.N.Y. Dec. 21, 2004); *Knight v. State Univ. of New York at Stony Brook*, 880 F.3d 636, 639 (2d Cir. 2018) (listing thirteen non-exhaustive factors used to identify employment relationships, including "the hiring party's right to control the manner and means by which the product is accomplished, . . . the method of payment, . . . [and] "the provision of employee benefits.").  Davila alleges no facts to support his claim that he has an employment relationship with OLAP.  The facts Davila alleged suggest a relationship closer to one of a licensing board and an applicant, and licensing bodies are generally not employers within the meaning of Title VII.  *See Bonaby v. New York City Taxi &*

*Limousine Comm'n.*, No. 02-cv-5423, 2003 WL 21649453, at *4 (S.D.N.Y. July 14, 2003) (dismissing

claims brought by a plaintiff whose license was revoked by the local Taxi Limousine Commission

and observing that "[a]lthough the granting or with[h]olding of a license affects the employment

prospects of a would-be licensee, in most cases this has not made the licensing body an employer

who can be liable under Title VII."); *Gaddy v. Ports America*, No. 13-cv-3322, 2015 WL 3929693, at *5

(S.D.N.Y. 2015) ("Courts have concluded that, because Congress had the power to include licensing

within its definition of employer and did not do so, Congress did not intend for Title VII . . . to

cover licensing.").  In short, Davila does not allege that he is an employee of OLAP, nor does he

plead any facts from which the Court could infer that he is an employee of OLAP.  Consequently,

Title VII does not apply.

Even assuming *arguendo* that Davila was an employee of OLAP, he would still fail to state a

claim under Title VII.  To survive a motion to dismiss under Title VII, "what must be plausibly

supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was

qualified, suffered an adverse employment action, and has at least minimal support for the

proposition that the employer was motivated by discriminatory intent."  *Littlejohn v. City of New York*,

795 F.3d 297, 311 (2d Cir. 2015); *see also DeVore v. Neighborhood Hous. Servs. of Jamaica Inc.*, No. 15 Civ.

6218 (PKC), 2017 WL 1034787, at *4 (E.D.N.Y. Mar. 16, 2017) ("At the pleading stage, a plaintiff

does not need to prove discrimination, or even allege facts establishing every element of the

*McDonnell Douglas* prima facie case, but the facts alleged must give plausible support to the reduced

requirements of the prima facie case."  (citing *Littlejohn*, 795 F.3d at 311) (internal quotation marks

omitted)).

Among other shortcomings, Davila did not plead any facts suggesting that OLAP was

motivated by discriminatory intent with respect to Davila's membership in a protected class when it

terminated Davila's accreditation.  Accordingly, Davila's Title VII claim is dismissed.

Construing the complaint liberally, Davila's allegations could be interpreted to also raise New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") claims. However, Davila's claims under both statutes fail because they suffer from the same deficiencies as his Title VII claim.

Discrimination claims pursuant to the NYSHRL are subject to the same standard as Title VII claims. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007); *Salazar v. Ferrara Bros. Bldg. Materials Corp.*, No. 13-cv-3038 (JG), 2015 WL 1535698, at *5 (E.D.N.Y. Apr. 6, 2015). Therefore, Plaintiff's NYSHRL claim is dismissed for the reasons described above.

Although NYCHRL claims had for many years "been treated as coextensive with state and federal counterparts," the New York City Council, in passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), "rejected such equivalence" in favor of a broader remedial scope. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009). The Restoration Act established two new rules of construction for the NYCHRL: (1) "a 'one-way ratchet,' by which interpretations of state and federal civil rights statutes can serve only 'as a floor below which the City's Human Rights law cannot fall'"; and (2) a requirement that the NYCHRL provisions "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting Restoration Act §§ 1, 7). The Second Circuit has clarified that these amendments to the Restoration Act require courts to analyze NYCHRL claims "separately and independently from any federal and state law claims." *See id.* The NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Id.* (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011)).

Section 8-107(1)(a) of the NYCHRL makes it "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the . . . race . . . color[, or] national origin . . . of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a). In contrast to Title VII, NYCHRL "does not require 'a connection between the discriminatory conduct and a materially adverse employment action.'" *Garrigan v. Ruby Tuesday, Inc.*, No. 14-cv-155 (LGS), 2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014) (quoting *Mihalik*, 615 F.3d at 113). Instead, the proper inquiry under the NYCHRL is whether the plaintiff "was treated 'less well' because of her [membership in a protected class]." *Pena-Barrero v. City of New York*, No. 14-cv-9550 (VEC), 2017 WL 1194477, at *15 (S.D.N.Y. Mar. 30, 2017) (quoting *Mihalik*, 715 F.3d at 111).

Even under the NYCHRL's broad and liberal standard, Plaintiff's discrimination claims fail because, for the reasons described earlier in this opinion, he is not an employee of OLAP, and he did not allege that any adverse employment action he suffered was "caused by a discriminatory motive," even in part. See *Mihalik*, 715 F.3d at 110. Accordingly, Plaintiff's NYCHRL claim is dismissed.

## J. Equitable Estoppel and Laches

Davila raises new legal arguments based on the doctrines of equitable estoppel and laches for the first time in his opposition. Davila also raises new factual allegations in support of these arguments that contradict his complaint, his opposition, and the documents he submitted in connection with those documents. As a result, the Court need not consider this claim.

Even if the Court were to consider this claim, it would fail. In essence Davila's argument is that when he first participated the R&A program the applicable eligibility requirements only barred applicants with felony convictions on or after July 27, 2000; Davila was convicted of a felony in

1988. Pl.'s Am. Opp'n at 7–9.  Because he was admitted into the program despite his felony conviction, and OLAP later changed the rules, Davila contends that OLAP is estopped from terminating him.  Davila also contends that because OLAP waited "seven years" after his initial application to terminate him, they are barred from terminating his accreditation under the doctrine of laches.  *Id.* at 15.

      The defenses of equitable estoppel and laches are not available as defenses against to the federal government.  "The United States has traditionally not been subject to the defense of laches." *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 278 (2d Cir. 2005) (holding that laches is inapplicable to the United States in the absence of an applicable exception).  Moreover, equitable estoppel applies against the government only "in the most serious of circumstances" when a party has reasonably and detrimentally relied on the government's misrepresentation, and the government has engaged in affirmative misconduct.  *United States v. Sampson*, 898 F.3d 270, 285 (2d Cir. 2018) (stating that there is an "extraordinarily strong presumption against applying equitable estoppel against the government.") (citing *Drozd v. I.N.S.*, 155 F.3d 81, 90 (2d Cir. 1998))); *see also Tipadis v. Comm'n. of Social Security*, 284 F. Supp. 3d 517, 524 (S.D.N.Y. 2018) (citations omitted).  "[A] government agency promulgating rules or making decisions in its governmental capacity cannot be equitably estopped from reconsidering prior agency decisions simply by virtue of plaintiff's reliance on the earlier decision."  *Keating v. Carey*, 706 F.2d 377, 382 n.6 (2d Cir. 1983).

      Davila does not allege that the United States engaged in affirmative misconduct here; rather, the facts that Davila allege show that the Government applied a new regulation to Davila, and acted in accordance with that regulation.  As a result, Davila's claim that the doctrines of equitable estoppel and laches prevent OLAP from enforcing its revocation of his accreditation is without merit.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED.  However, because this is the first adjudication of Plaintiff's claims on the merits in this case, the dismissal as to Plaintiff's RFRA, *Bivens*, and APA claims are without prejudice.  *See Terry v. Inc. Vill. Of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (explaining that "district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile").

"Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 62 (2d Cir. 2016) (quoting *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 132 (2d Cir. 1993)).  "Although district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings, leave to amend need not be granted when amendment would be futile." *Terry*, 826 F.3d at 633. Here, the Court declines to grant Plaintiff leave to replead his *Clearfield Trust* claim, his claim against Lang in his individual capacity, his New York Correction Law claim, his estoppel and laches claims, and his Title VII, NYSHRL, and NYCHRL claims because, for the reasons stated above, any amendment as to those claims would be futile.

The Clerk of the Court is directed to terminate the motion pending at ECF No. 10 and to send a copy of this order to Plaintiff by certified mail and by regular, first-class mail.

SO ORDERED.

Dated:   October 23, 2018
         New York, New York

_____
GREGORY H. WOODS
United States District Judge

34